GORDON SILVER
GERALD M. GORDON, ESQ.
Nevada Bar No. 229
E-mail: ggordon@gordonsilver.com
BRIAN R. IRVINE, ESQ.
Nevada Bar No. 7758
E-mail: birvine@gordonsilver.com
GABRIELLE A. HAMM, ESQ.
Nevada Bar No. 11588
E-mail: ghamm@gordonsilver.com
100 West Liberty Street, Ste. 940
Reno, Nevada 89501
Telephone (775) 343-7500
Facsimile (775) 786-0131

SMITH, GAMBRELL & RUSSELL, LLP
BRIAN P. HALL, ESQ.
(*pro hac vice pending*)
Georgia Bar No. 318171
E-mail: bhall@sgrlaw.com
NICHOLAS J. ROECKER, ESQ.
(*pro hac vice pending*)
Georgia Bar No. 211708
E-Mail: nroecker@sgrlaw.com
Promenade II, Suite 3100
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309
Telephone (404) 815-3500
Facsimile (404) 815-3509

*Proposed Counsel to the Debtors and Debtors-in-Possession*

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF NEVADA

In re:

GLOBAL AXCESS CORP., a Nevada corporation,

☐ Affects this Debtor.

☒ Affects all Debtors.

☐ Affects NATIONWIDE MONEY SERVICES, INC., a Nevada corporation.

☐ Affects NATIONWIDE NTERTAINMENT SERVICES, INC., a Nevada corporation.

☐ Affects EFT INTEGRATION, INC., a Florida corporation.

Case No.: 13-51562
Chapter 11

Pending joint administration with:

13-51563    Nationwide Money Services, Inc.
13-51564    Nationwide Ntertainment Services, Inc.
13-51565    EFT Integration, Inc.

Date:    OST PENDING
Time:    OST PENDING

**DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 FOR ORDER AUTHORIZING DEBTORS TO: (A) USE CASH COLLATERAL ON AN EMERGENCY BASIS PENDING A FINAL HEARING; (B) INCUR POSTPETITION DEBT ON AN EMERGENCY BASIS PENDING A FINAL HEARING; AND (C) GRANT ADEQUATE PROTECTION AND PROVIDE SECURITY AND OTHER RELIEF TO <u>FIFTH THIRD BANK AND FIFTH THIRD EQUIPMENT FINANCE COMPANY</u>**

Global Axcess Corp., a Nevada corporation ("<u>Global</u>"), Nationwide Money Services Inc., a Nevada corporation ("<u>Nationwide</u>"), Nationwide Ntertainment Services, Inc., a Nevada corporation ("<u>Ntertainment</u>"), and EFT Integration, Inc., a Florida corporation ("<u>EFT</u>," together

Gordon Silver
Attorneys At Law
100 W. Liberty Street,
Suite 940
Reno, Nevada 89501
(775) 343-7500

104281-001/2013617_4

with Global, Nationwide, and Ntertainment, the "Debtors"), debtors and debtors-in-possession, pursuant to Sections[1] 105, 361, 362, 363 and 364 of the Bankruptcy Code, hereby move this Court (the "Motion") for entry of an order authorizing Debtors to: (a) use certain Cash Collateral on an emergency basis pending a Final Hearing; (b) incur Postpetition Debt on an emergency basis pending a Final Hearing; and (c) grant adequate protection and provide security and other relief to Fifth Third Bank in its capacity as the lender ("Prepetition Lender") party to the Prepetition Loan Agreements, Fifth Third Equipment Finance Company in its capacity as the lessor ("Prepetition Lessor") party to the Prepetition Lease Agreements. In support thereof, the Debtors respectfully represent as follows:

## I.
## SUMMARY OF RELIEF REQUESTED

Among other things, the Debtors seek authority to obtain post-petition secured loans equal to $16,729,164.58, subject to the terms and conditions of that certain Debtor In Possession Loan Agreement (the "DIP Loan Agreement")[2] by and between the Debtors and Fifth Third Bank in its capacity as DIP Lender (the "Postpetition Lender") substantially in the form attached hereto as **Exhibit "1,"** the Interim Financing Order substantially in the form attached hereto as **Exhibit "2,"** and related loan documents. In accordance with Bankruptcy Rule 4001 and Local Rule 4001, below is a summary of the terms of the proposed DIP Loans and the Debtors' use of cash collateral of the Postpetition Lender:[3]

(a) <u>Borrowers</u>. Global Axcess Corp., Nationwide Money Services, Inc., Nationwide Ntertainment Services, Inc. and EFT Integration, Inc.

---

[1] All references to "Chapter" and "Section" herein shall be to the "Bankruptcy Code" appearing in Title 11 of the U.S. Code; all references to a "Bankruptcy Rule" shall be to the Federal Rules of Bankruptcy Procedure; and all references to a "Local Rule" shall be to the Local Rules of Bankruptcy Practice of the U.S. District Court for the District of Nevada.

[2] Capitalized terms contained herein shall have the meanings set forth in the DIP Loan Agreement.

[3] The description contained herein of the terms of the DIP Facility is intended as a summary of the terms expressly stated in the DIP Loan Agreement. The summary of the terms contained herein is qualified in its entirety by the DIP Loan Agreement. To the extent there is any discrepancy between this summary and the DIP Loan Agreement, the DIP Loan Agreement controls.

Gordon Silver
Attorneys At Law
100 W. Liberty Street, Suite 940
Reno, Nevada 89501
(775) 343-7500

104281-001/2013617_4

2

(b) <u>Postpetition Lender</u>. Fifth Third Bank.

(c) <u>Loan Facilities</u>.

    (i)    DIP Term Loan A in the original principal amount of $7,578,233 to be used to repay the Prepetition Leasing Obligations. The Debtors are requesting approval of DIP Term Loan A at the Interim Hearing;

    (ii)    DIP Term Loan B in the original principal amount of $5,150,931.58 to be used to repay the Prepetition Term Obligations. The Debtors are not requesting approval of DIP Term Loan B at the Interim Hearing and will request approval at the Final Hearing; and

    (iii)    DIP Revolver Commitment in the original principal amount of $4,000,000 to be used to (1) provide for the working capital requirements and other general corporate purposes of the Debtors during the pendency of their chapter 11 cases, in accordance with the terms of the Interim Financing Order and the Budget; and (2) repay certain other prepetition claims as may be permitted by the Bankruptcy Court pursuant to "first day" orders, if any, satisfactory to the Postpetiton Lender. The Debtors are requesting approval of the DIP Revolver Commitment at the Interim Hearing. The Prepetition Revolving Obligations are $2,028,607.17 on the Petition Date and the Debtors anticipate borrowing approximately $1.1 million under the DIP Revolver Commitment during the period after the entry of an Interim Financing Order and prior to a Final Financing Order.

(d) <u>Interest Rate</u>. LIBOR plus 7.0%. The default interest rate is the otherwise applicable interest rate plus 5%.

(e) <u>Fees and Expenses</u>. The Borrowers shall pay the Postpetition Lender fully earned and non-refundable closing fees equal to 1% of the Interim DIP Amount (the DIP Revolver Commitment plus DIP Term Loan A) (approximately $111,000) due and payable upon entry of the Interim Financing Order. An additional closing fee equal to 1% of DIP Term Loan B (approximately $52,000) shall be due and payable upon entry of the Final Order. The Borrowers shall pay on demand all costs and expenses, including reasonable attorneys' fees, actually incurred by the Postpetition Lender in connection with the DIP Loans.

(f)    <u>Termination</u>. The DIP Loans may be terminated upon the occurrence of the following: (i) the date on which Postpetition Lender provides, via facsimile or overnight mail, written notice to counsel for Debtors and counsel for any Committee of the occurrence and continuance of an Event of Default; (ii) the date that is 21 days following the entry of this Order if the Final Financing Order is not entered in form and substance satisfactory to Postpetition Lender by such date; (iii) the date of the Final Hearing, if the Interim Financing Order is modified at the Final Hearing in a manner unacceptable to Prepetition Financing Group or Postpetition Lender; (iv) September 6, 2013, if one or more orders of the Court approving the sale of all or substantially all of the Debtors' assets are not entered in form and substance acceptable to Postpetition Lender prior to such date; (v) the closing date of the sale of

Gordon Silver
Attorneys At Law
100 W. Liberty Street,
Suite 940
Reno, Nevada 89501
(775) 343-7500

104281-001/2013617_4

3

substantially all of the assets of the Debtors (which shall include, for the avoidance of doubt, the "ATM Business" (as defined in the Stalking Horse Asset Purchase Agreement)) in accordance with the Sale Covenants; (vi) the date on which the Aggregate Debt is indefeasibly paid in full in cash; and (g) October 31, 2013.

(h)  Priority and Liens. Subject to the Carveout, all Obligations under the DIP Loan Agreement shall, at all times: (i) pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to super-priority claim status in the chapter 11 cases (the "DIP Superpriority Claim"); (ii) pursuant to section 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, be secured by perfected liens (the "DIP Liens") on substantially all of the Debtors' assets (including, solely with respect to the DIP Revolving Loans, claims or causes of action arising under sections 544, 545, 547, 548, 550 or 553 of the Bankruptcy Code (collectively, the "Avoidance Actions")) (the "Collateral"). The DIP Liens shall be senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the Collateral, except that the Postpetition Liens (as defined in the Interim Financing Order) shall be junior only to the Permitted Priority Liens (including the Carveout) and the Prepetition Liens (as defined in the Interim Financing Order).

(i)  Use/Application of Cash Collateral. Cash Collateral of the Prepetition Financing Group and the Postpetition Lender will be used by the Debtors pursuant to the terms of the Interim Financing Order until the Termination Date. Postpetition Lender is authorized to apply all Cash Collateral (other than Disposition Proceeds) now or hereafter in Postpetition Lender's possession or control as follows: (1) first, to the payment of the Prepetition Revolving Obligations in accordance with the Prepetition Documents, until paid in full, in cash, (2) second, to the payment of Postpetition Debt consisting of Postpetition Charges, (3) third, to payment of the DIP Revolving Loans, (4) fourth, to the payment of the DIP Term Loan A, (5) fifth, (i) pending the Final Hearing, to the payment of the Prepetition Term Obligations, and (ii) upon entry of the Final Order, the DIP Term Loan B and (6) sixth, to any other Aggregate Obligations (as defined in the Interim Financing Order).

(j)  Adequate Protection. Prepetition Financing Group will be entitled to adequate protection to the extent required under Code §§ 361, 362, 363 or 364 (including for any decrease in the value of such interests in the Prepetition Collateral from and after the Filing Date) and is granted replacement liens as security for payment of the Prepetition Debt. If and to the extent the adequate protection of the interests of Prepetition Financing Group in the Prepetition Collateral granted pursuant to this Order proves insufficient, Prepetition Financing Group would also be entitled to an allowed claim under Code § 507(b), subject to the Carveout, in the amount of any such insufficiency, with priority over: (1) all costs and expenses of administration of the Bankruptcy Cases that are incurred under any provision of the Code; and (2) the claims of any other party in interest under Code § 507(b).

(k)  Use of Disposition Proceeds. With respect to any Cash Collateral that constitutes Disposition Proceeds, except as Postpetition Lender may otherwise elect, Postpetition Lender is authorized to apply all Disposition Proceeds as follows: (1) first, to the payment of the Prepetition Revolving Obligations in accordance with the Prepetition Documents, until paid in full, in cash, (2) second, to the payment of Postpetition Debt consisting of Postpetition Charges, (3) third, to the payment of the DIP Term Loan A, (4) fourth, (i) pending the Final Hearing, to the payment of the Prepetition Term Obligations, and (ii) upon entry of the Final Order, the DIP

Gordon Silver
Attorneys At Law
100 W. Liberty Street,
Suite 940
Reno, Nevada 89501
(775) 343-7500

104281-001/2013617_4

4

Term Loan B, (5) fifth, to payment of the DIP Revolving Loans, and (6) sixth, to any other Aggregate Obligations.

(l) <u>Section 506(c) Waiver</u>. As a further condition of the DIP Loan Agreement and any obligation of the Postpetition Lender to make credit extensions pursuant to the DIP Loan Agreement, upon entry of the Final Financing Order approving this provision, the Debtors, their estates, shall be deemed to have waived any claim to surcharge the Collateral under section 506(c) of the Bankruptcy Code. In addition, upon entry of the Bid Procedures Order (as defined in the Interim Financing Order), there shall be no surcharge of the Aggregate Collateral for any amount the Debtors may owe to the Purchaser under the Stalking Horse Asset Purchase Agreement, including the Break-up Fee as approved by the Court.

(m) <u>Carveout</u>. The DIP Loan Agreement provides for a Carveout for (i) all fees required to the Office of the United States Trustee pursuant to 28 U.S.C. Section 1930(a) and (ii) the allowed fees and disbursements of each Carveout Professional (as defined in the Interim Financing Order). Specific Carveouts for each Carveout Professional are set forth in the Budget.

(n) <u>Financial Covenants</u>. During the term of the DIP Loan Agreement, with respect to each weekly line item set forth in the Budget, and calculated on a cumulative basis, (i) with respect to line items related to receipts, Debtors will not permit receipts to fall below 90% of the budgeted amount, (ii) with respect to line items related to disbursements (other than for professional fees), Debtors will not permit disbursements to exceed 110% of such line item, (iii) with respect to professional fees, Debtors will not incur professional fees in excess of the amount set forth in the Budget for such period, (iv) Debtors will not permit the aggregate, cumulative variance of all line items in the Budget to exceed $250,000 at any time, or (v) during the term of the DIP Loan Agreement, for each four-week calendar period occurring after the Petition Date, Debtors will not incur aggregate professional fees for professionals engaged by Debtors greater than the aggregate amount for such professional fees set forth in the Budget for such period.

(m) <u>Rights and Remedies Upon Default</u>. Any automatic stay otherwise applicable to the Postpetition Lender shall be modified so that upon the Termination Date all authorization to use Cash Collateral and incur Postpetition Debt will automatically terminate and all DIP Loans immediately will become due and payable. The Interim Financing Order further provides that on the fifth business day after the Termination Date, at Postpetition Lender's election, the Prepetition Financing Group and the Postpetition Lender shall have automatic and immediate relief from the automatic stay with respect to the Aggregate Collateral provided that the Debtors may contest the right of the Postpetition Lender to exercise its remedies based upon whether an Event of Default has occurred within such five (5) business day time period, and the Postpetition Lender shall be restrained from exercising its rights and remedies with respect to Aggregate Collateral pending the Courts determination whether an "Event of Default" occurred.

## II.
## JURISDICTION AND VENUE

1. This Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

Gordon Silver
Attorneys At Law
100 W. Liberty Street,
Suite 940
Reno, Nevada 89501
(775) 343-7500

104281-001/2013617_4

2.   Pursuant to Local Rule 9014.2, Debtors consent to entry of final order(s) or judgment(s) by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders for judgment consistent with Article III of the United States Constitution.

## III.
## BACKGROUND

3.   Global is a Nevada corporation organized in 1984 and operates primarily through its wholly-owned subsidiaries, Nationwide, Ntertainment, and EFT, as an independent provider of self-service kiosk services. The Debtors offer ATM management and support services focused on serving the self-service kiosk needs of merchants, grocers, retailers, and financial institutions nationwide.

4.   Nationwide is the primary operating company engaged in the business of operating a network of ATMs across a total of forty-six (46) states. The ATMs provide debit and credit cardholders with access to cash, account information and other services at locations and times convenient to the cardholder. The ATM network currently includes approximately 4,500 ATMs, principally in regional chains and individual merchant locations, providing network processing for an average 1.7 million ATM financial transactions per month.

5.   Ntertainment is the primary operating company engaged in the business of operating a network of self-service DVD rental kiosks, mainly through the tradename "InstaFlix." The Debtors currently deploy approximately 323 DVD rental kiosks, most of which are located on military bases through a contract with "The Exchange," a quasi-governmental organization supporting the needs of the Department of Defense.

A.   **The Debtors' ATM Operations.**

6.   In a typical ATM transaction in the Debtors' network, a debit or credit cardholder inserts a debit or credit card into an ATM to withdraw funds or perform other financial transactions. The transaction is routed from the ATM to a processing center at U.S. Bank National Association, d/b/a Elan Financial Services ("Elan") or First Data Merchant Services Corporation ("First Data" and, together with Elan, the "Processors") by dedicated

Gordon Silver
Attorneys At Law
100 W. Liberty Street,
Suite 940
Reno, Nevada 89501
(775) 343-7500

104281-001/2013617_4

6

communication links. The processing center computers identify the card issuer network and the card issuer by the information contained within the card's magnetic strip. The transaction is then switched to the local issuing bank or card organization (or its designated processor) through the applicable network for authorization. Once the authorization is received, the authorization message is routed back to the ATM and the transaction is completed.

7. The transaction volumes processed on any given ATM are affected by a number of factors, including location of the ATM, the amount of time the ATM has been installed at that location, seasonality, and market demographics. The Debtors processed a total of approximately 20,100,000 transactions in fiscal 2012 and 18,700,000 transactions in fiscal 2011.

8. The Debtors utilize, through agreements with several banks, cash ("Vault Cash") for approximately 2,200 of the Debtors' ATMs, which are located throughout the United States. The Vault Cash is replenished by contracted armored car carriers periodically based upon cash withdrawals. In addition, branded cash partners provide cash directly to 375 ATMs.

9. The Debtors' largest relationship for the provision of vault cash is with Elan under the terms of a Cash Provisioning Agreement. The Cash Provisioning Agreement sets the terms by which the Debtors obtain Vault Cash from Elan for the specified locations and the fees which are associated therewith. There are also sub relationships with Elan and each of five major armored car carriers (Garda, Loomis, Rochester, ATM Solutions, and Brinks) through tri-party agreements. These agreements are necessary to define the relationships with each of the major security companies that handle the Vault Cash.

10. The fees paid by the Debtors for the use of Vault Cash directly relate to variable interest rates charged by the financial institutions that supply the cash. Vault Cash remains the property of the financial institution and, as such, is not reflected on the Debtors' financial statements. During 2012, Vault Cash accessed each month ranged from $35.0 million to $55.0 million and fees for the use of the Vault Cash totaled approximately $900,000.

11. Revenue is principally derived from two types of fees charged for processing transactions on the ATM network, as follows:

Gordon Silver
Attorneys At Law
100 W. Liberty Street,
Suite 940
Reno, Nevada 89501
(775) 343-7500

104281-001/2013617_4

7

a. <u>Interchange Fees</u>. An interchange fee from the issuer of the debit or credit card for processing a transaction when a cardholder uses an ATM is paid to the applicable network and distributed by the network to the processor, and the processor then sends a portion of the interchange to the card acquirer/Debtors. The maximum amount of the interchange fees is established by the national and regional networks but generally range from $0.00 to $0.70 per cash withdrawal. Interchange fees for balance inquiries, account transfers, and denied transactions are generally substantially less than fees for cash withdrawals.

b. <u>Surcharge/Convenience Fees</u>. Federal regulations permit the imposition of surcharge/convenience fees on cash withdrawals from ATMs. The surcharge/convenience fees for most of the ATMs in the Debtors' network range between $1.50 and $2.95 per withdrawal. The surcharge/convenience fees for other ATMs in the Debtors' network ranges between $0.50 and $7.50 per withdrawal. The Debtors retain the full surcharge/convenience fee for cash withdrawal transactions on owned ATMs, but often rebate a portion of the fee to the various parties involved in the placement of the ATM location under the applicable lease for the ATM site.

12. The Debtors also derive revenue from providing ATM network management services to banks and other third-party owners of ATMs included in the ATM network. These services include 24-hour transaction processing, monitoring and notification of ATM status and cash condition, notification of ATM service interruptions, in some cases dispatch of field service personnel for necessary service calls, and cash settlement and reporting services. Approximately 1.6% of the Debtors annual revenue is derived from these sources.

B. **The Debtors' DVD Operations.**

13. To diversify and become less dependent upon the ATM business, the Debtors entered into the DVD rental business where there appeared to be synergies in the customer base and in many operational aspects of the businesses. The DVD kiosks allow a consumer to rent DVDs using a credit card for a typical charge of $1.00 to $1.50 per day and then return the DVD to the DVD kiosk.

14. In 2010, the Debtors entered into a contract to place DVD machines in 323 grocery store locations with The Great Atlantic and Pacific Tea Company ("<u>A&P</u>"), also one of its ATM customers, and began deploying the DVD kiosks in July 2010. Unfortunately, the Debtors and the customers experienced both hardware and software issues with the equipment, and due to the difficulties end users experienced with the kiosks, the revenues derived from the

Gordon Silver
Attorneys At Law
100 W. Liberty Street,
Suite 940
Reno, Nevada 89501
(775) 343-7500

104281-001/2013617_4

8

DVD kiosks were significantly less than anticipated. A&P and its affiliates filed chapter 11 bankruptcy cases in 2010 and subsequently rejected the Debtors' DVD contract.

15. In 2011, the Debtors redeployed approximately 212 of the DVD kiosks to military bases pursuant to a contract with The Exchange. This contract was acquired from Tejas Video and the assignment was confirmed by The Exchange and the Department of Defense in early 2011. The DVD machines operated by Tejas Video on the military bases at the time of the acquisition were deemed to be obsolete and were replaced by the units redeployed from A&P. The Debtor currently operates 278 machines at The Exchange locations on military bases. The original contract was terminated in June 2013. After issuing a Request for Proposal, The Exchange determined that it would not extend the contract and the Debtors are in the process of marketing the various assets of the DVD business.

## IV.
## RELIEF REQUESTED

16. The Debtors seek, pursuant to sections 105, 361, 362, 363, and 364 of the Bankruptcy Code, Bankruptcy Rules 4001(b) and (c) and Local Rule 4001, the entry of an interim and final order, *inter alia*, authorizing the Debtors to obtain a post-petition secured loan (the "DIP Facility") in a principal amount of up to $4,000,000 pursuant to that certain Debtor in Possession Loan Agreement (the "DIP Loan Agreement") by and between Global Axcess Corp., Nationwide Money Services, Inc., Nationwide Ntertainment Services, Inc. and EFT Integration, Inc. as the Debtors and Debtors in Possession, and the Postpetition Lender substantially in the form attached hereto as Exhibit 1.

## V.
## DEBTORS' PRE-PETITION DEBT STRUCTURE AND HISTORY

17. Between June 18, 2010, and December 29, 2011 the Debtors entered into four credit facilities with Prepetition Lender with aggregate commitments of $12,650,000, and on June 18, 2010, the Debtors entered into an equipment leasing facility with Prepetition Lessor, with an equipment finance line of up to $10.0 million. In addition, the Debtors entered into a 12-month forward rate swap agreement on $20 million with the Prepetition Lender which resulted in the Debtors effectively paying a fixed interest rate on the Vault Cash.

Gordon Silver
Attorneys At Law
100 W. Liberty Street,
Suite 940
Reno, Nevada 89501
(775) 343-7500

104281-001/2013617_4

9

18. In 2012, the Debtors had defaulted on their obligations under the prepetition credit facilities and prepetition leasing facilities by failing to, among other things, meet certain financial covenants and make certain payments required thereunder. On November 9, 2012, the Debtors entered into a Forbearance Agreement and Amendment with the Prepetition Lending Group, which was subsequently amended with the current forbearance agreement having expired on June 11, 2013. The terms of the Forbearance Agreement and Amendment provided the Debtors with a revolving line of credit in the maximum principal amount of $1,500,000.

19. As of the Petition Date, the outstanding amount owed to the Prepetition Financing Group under the credit facilities (including the revolving line of credit) and the leasing facilities was not less than $14,757,771.75, exclusive of accrued and accruing fees, costs, and expenses. The Debtors' exposure under the swap agreement, if terminated prior to its agreed term, was approximately $304,745.34 as of the Petition Date.

## VI.
## THE DEBTORS' POST-PETITION FINANCING ARRANGEMENTS

20. Without adequate post-petition financing, the Debtors would not have sufficient available sources of working capital to operate their businesses in the ordinary course for a period of time sufficient to maximize the value of their assets for the benefit of all stakeholders. The uncertainty concerning the Debtors' financial condition has curtailed the Debtors' availability of credit and acceptable credit terms. More specifically, the Debtors' ability to finance their operations and administer these bankruptcy cases is dependent on their ability to obtain the funds made available under the DIP Loans and to use the cash collateral of the Prepetition Lending Group.

21. Any disruption of the Debtors' operations would be devastating at this critical juncture. The inability of the Debtors to obtain sufficient liquidity and to make payments on certain obligations on a timely basis may result in, *inter alia*, the Debtors' inability to continue the operation of their ATM and DVD business and to consummate the sale of the "ATM Business" as set forth in the Stalking Horse Asset Purchase Agreement. If this were to occur, the impact on the Debtors' estates would be catastrophic and would result in material harm to all of

Gordon Silver
Attorneys At Law
100 W. Liberty Street,
Suite 940
Reno, Nevada 89501
(775) 343-7500

104281-001/2013617_4

10

the Debtors' creditors and other constituents. In light of the foregoing, the Debtors have determined, in the exercise of their sound business judgment, that the DIP Facility which, subject to the terms thereof permits the Debtors to finance the operation of their businesses, in order to achieve a closing pursuant to the Stalking Horse Purchase Agreement or to a successful Bidder in the event an Auction is held.

22.     The Debtors believe that the debtor in possession financing offered by the Postpetition Lender presents the best option available to them and would enable the Debtors to preserve their value as a going concern. The Debtors have engaged in good-faith and extensive, arm's-length negotiations with the Postpetition Lender. These negotiations culminated in an agreement by the Postpetition Lender to provide post-petition financing on the terms and subject to the conditions set forth in the DIP Loan Agreement and the interim order substantially in the form attached hereto as <u>Exhibit 2</u> (the "<u>Interim Financing Order</u>"). The significant elements of the proposed DIP Loans and the Interim Financing Order are set forth above.

23.     The Interim Financing Order provides for the Postpetition Lender to refinance the obligations of the Prepetition Lessor under DIP Term Loan A. The refinancing of the Prepetition Lease Obligations will result in the Debtors having "clean" title (subject to the Postpetition Liens) to all of the equipment and other assets which are financed under the Prepetition Lease Agreements since the Prepetition Lessor will execute bills of sale and other required documentation terminating the lease and transferring any interests in the equipment and other assets to the Debtors. The Debtors have reviewed the Prepetition Lease Agreements and believe that the financing arrangement is not a true lease and cannot be assumed or rejected under Section 365 of the Bankruptcy Code, and believe that in consideration of the additional financing being provided by the Postpetition Lender, is in the best interests of their estates. Confirmation of the Debtors' ownership of the equipment and other assets currently subject to the Prepetition Lease Agreements is important to FCTI and may be important to other potential purchasers as well. In addition, the refinancing of the Prepetition Lease Obligations and the consolidation of all of the Debtors' financing into one postpetition credit facility with one lender, the Postpetition Lender, has the additional benefit of administrative ease for the Debtors' estates.

Gordon Silver
Attorneys At Law
100 W. Liberty Street,
Suite 940
Reno, Nevada 89501
(775) 343-7500

104281-001/2013617_4

11

# VII.
# LEGAL BASES FOR REQUESTED RELIEF

### A. The Proposed DIP Loans

Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, then the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in sections 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien. See 11 U.S.C. § 364(c).

Section 364(d)(1) of the Bankruptcy Code provides that the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt if:

>   (A) the trustee is unable to obtain such credit otherwise; and
>
>   (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

See 11 U.S.C. § 364(d)(1); see also In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

The credit provided under the DIP Loans will enable the Debtors to finance their business operations, including the ability to operate their businesses in an orderly and reasonable manner pending the consummation of a sale pursuant to the Stalking Horse Asset Purchase Agreement or otherwise to preserve and enhance the value of their assets and enterprise for the benefit of all parties in interest. It is expected that the availability of credit under the DIP Loans will provide the Debtors with the necessary liquidity to continue their ordinary course business operations in order to maximize the return available to the Debtors' creditors in these bankruptcy cases so that the Debtors can close a sale transaction in accordance with the sale covenants. Finally, the

Gordon Silver
Attorneys At Law
100 W. Liberty Street,
Suite 940
Reno, Nevada 89501
(775) 343-7500

104281-001/2013617_4

12

implementation of the DIP Loans will be viewed favorably by the Debtors' employees, vendors and customers and thereby permit the Debtors to continue to operate their businesses during the bankruptcy process and work to consummate a successful 363 sale.

1.  **The Debtors Do Not Have An Alternative to the DIP Loans.**

The Debtors are unable to obtain unsecured credit or debt allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations, nor have the Debtors been able to obtain post-petition financing from an alternative prospective lender on more favorable terms and conditions than those for which approval is sought herein.

A working capital facility of the type needed in these cases could not have been obtained on an unsecured basis. Moreover, potential sources of the proposed DIP Loans or any alternative investment for the Debtors were extremely limited. It is well established that the appropriateness of a proposed post-petition financing facility must be considered in light of current market conditions. See, e.g., In re Lyondell Chem. Co., No. 09-10023, Transcript of Record at 734-35:24-1 (Bankr. S.D.N.Y. Mar. 5, 2009) (recognizing "the terms that are now available for DIP facilities in the current economic environment aren't as desirable" as they have been in the past); In re Snowshoe Co., Inc., 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is not required to seek credit from every possible lender before determining such credit is available). Indeed, where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing." See, e.g., In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd, 99 B.R. 117 (N.D. Ga. 1989).

No party in interest can credibly deny that the current market for financing is exceedingly strained. Simply put, because of current economic conditions, there is no ready market for any financing, including debtor-in-possession financing or otherwise and provisions once considered "extraordinary" in debtor-in-possession financing arrangements have, for the time being, become standard. See, e.g., Lyondell, Tr. at 740:4-6 ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions reasonable here

Gordon Silver
Attorneys At Law
100 W. Liberty Street,
Suite 940
Reno, Nevada 89501
(775) 343-7500

104281-001/2013617_4

13

and now.").

In this extremely challenging credit market, the Debtor has been unable to find investors or alternative or better financing on the terms and of the type and magnitude required in these chapter 11 cases on an unsecured basis, or without offering terms substantially similar to those of the DIP Loans. The terms and conditions of the DIP Loans are fair and reasonable, and were negotiated by the parties in good faith and at arm's length. Based on this, as well as the foregoing factors, the DIP Loans are the only feasible financing option for the Debtors and is in the best interests of the Debtors' estates.

### 2. Application of the Business Judgment Standard.

As described above, after appropriate investigation and analysis and given the exigencies of the circumstances, the Debtors' management has concluded that the DIP Loans are the only alternative available in the circumstances of these cases. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. See, e.g., Group of Institutional Investors v. Chicago, Mil., St. P., & Pac. R.R. Co., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. In re Curlew Valley Assocs., 14 B.R. 506, 511–13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." Id. at 513–14 (footnotes omitted).

Gordon Silver
Attorneys At Law
100 W. Liberty Street,
Suite 940
Reno, Nevada 89501
(775) 343-7500

104281-001/2013617_4

14

The Debtors have exercised sound business judgment in determining that a post-petition credit facility is appropriate and have satisfied the legal prerequisites to borrow under the DIP Loans. The terms of the DIP Loans are fair and reasonable, are the result of arms-length negotiations and are in the best interests of the Debtors' estates. Accordingly, the Debtors should be granted authority to enter into the DIP Loans and borrow funds from the Postpetition Lender on the secured, administrative superpriority basis described above, pursuant to section 364(c) and (d) of the Bankruptcy Code, and take the other actions contemplated by the DIP Loan Agreement and as requested herein.

### 3. The DIP Loans are Necessary to Effectively Preserve the Assets of the Debtors' Estates and to Operate Their Businesses.

As with most other large businesses, the Debtors have significant cash needs. Accordingly, access to substantial credit is necessary to meet the day-to-day costs associated with financing the operation of the Debtors' businesses. In the absence of access to cash and credit, the Debtors may be unable to operate their businesses or to complete the bankruptcy process. In turn, without the DIP Loans, the Debtors' prospects for continuing to operate in the ordinary course pending a 363 sale will be seriously impaired and the Debtors' creditors, estates and other parties in interest will be materially harmed.

Given the Debtors' constrained liquidity, the DIP Loans are of critical importance to operating the Debtors' businesses and preserving the value of the Debtors' assets, thereby providing a greater recovery to the Debtors' creditors than would be realized if the Debtors were forced to convert to chapter 7. Accordingly, the Debtors submit that the availability of credit under the DIP Loans are necessary to preserve and enhance the value of their estates for the benefit of all stakeholders in these chapter 11 cases.

### 4. Adequate Protection.

Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of post-petition debt secured by senior or "priming" liens, provides that the Court may, after notice and a hearing:

Gordon Silver
Attorneys At Law
100 W. Liberty Street,
Suite 940
Reno, Nevada 89501
(775) 343-7500

104281-001/2013617_4

15

authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if–

(A) the trustee is unable to obtain credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

See 11 U.S.C. § 364(d)(1).

The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis. In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996). "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." Id. (quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)). Examples of adequate protection are provided for in section 361 of the Bankruptcy Code and include, but are not limited to: (i) making a cash payment or periodic cash payments to a secured creditor to the extent that the estate's use of property will result in a decrease in the value of such creditor's interest in the property; (ii) provisions for an additional or replacement lien to the extent that the use of such property will cause a decrease in the value of such entity's interest in the property; and (iii) granting such other relief as will result in the realization by the creditor of the indubitable equivalent of such creditor's interest in the property. See In re C.G. Chartier Constr., Inc., 126 B.R. 956, 960 (E.D. La. 1991).

In accordance with section 364(d), and consistent with the purposes underlying the provision of adequate protection, the proposed Interim Financing Order provides that adequate protection will be provided to the Postpetition Lender in connection with the Prepetition Liens (as defined in the proposed Interim Financing Order) to the extent of any diminution in value of their Prepetition Collateral (as defined in the proposed Interim Financing Order), as follows: (1) replacement liens on all assets of the Debtors' estates, immediately junior to the Postpetition Collateral, the Carveout, the Permitted Priority Liens, and the Prepetition Liens (as each is defined in the proposed Interim Financing Order); and (2) a superpriority claim, immediately junior to the Postpetition Collateral, the Carveout, the Permitted Priority Liens, and the

Gordon Silver
Attorneys At Law
100 W. Liberty Street,
Suite 940
Reno, Nevada 89501
(775) 343-7500

Prepetition Liens.

### 5. The Terms of the DIP Loans Are Fair, Reasonable, and Appropriate.

The proposed terms of the DIP Loans are fair, reasonable and adequate in that its terms neither (a) tilt the conduct of these cases and prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent motions by parties in interest from being decided on their merits. The purpose of the DIP Loans is to enable the Debtors to meet their ongoing operational expenses and allowed administrative bankruptcy expenses, thereby enabling the Debtors to maximize the return available to the Debtors' creditors.

The proposed DIP Loans provide that the security interests granted to the Postpetition Lender are subject to the Carveout. Bankruptcy courts generally find that such "carve-outs" are not only reasonable, but are necessary to insure that official committees and the debtor's estate will be assured of the assistance of counsel. See, e.g., In Ames Dep't Stores, Inc., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).

Likewise, the various fees and charges required by the Postpetition Lender under the Loans are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in section 364 of the Bankruptcy Code. See, e.g., In re Defender Drug Stores, Inc., 145 B.R. 312, 316–18 (9th Cir. BAP 1992) (authorizing credit arrangement under section 364, including a lender "enhancement fee").

The DIP Loans should be approved pursuant to section 364(e) of the Bankruptcy Code. Section 364(e) was designed to "encourage the extension of credit to debtors" by allowing lenders to "rely on a bankruptcy court's authorization of the transaction." See In re EDC Holding Co., 676 F.2d 945, 947 (7th Cir. 1982) (the purpose of section 364(e) is "to overcome people's natural reluctance to deal with a bankrupt firm whether as purchaser or lender by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction that they need not worry about their priority merely because some creditor is objecting to the transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy judge."); see also In re North Atlantic Millwork Corp., 155 B.R. 271, 279 (Bankr.

Gordon Silver
Attorneys At Law
100 W. Liberty Street,
Suite 940
Reno, Nevada 89501
(775) 343-7500

104281-001/2013617_4

17

D. Mass. 1993) ("The purpose of section 364(e) is to allow good-faith lenders to rely upon conditions as the time they extend credit and to encourage lenders to lend to bankrupt entities.")

The DIP Loan Agreement was the result of good faith and arm's length negotiations, with all parties represented by counsel. As set forth above, the Debtors believe that the terms of the DIP Loan Agreement are fair and reasonable under the circumstances, and that the Postpetition Lender is entitled to the benefits of section 364(e) of the Bankruptcy Code.

### 6. Request for Modification of Automatic Stay.

As set forth more fully in the proposed Interim Financing Order, the proposed DIP Loan Agreement contemplates a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code to permit the Postpetition Lender to take certain actions required or permitted by the Interim Financing Order. More specifically, the Interim Financing Order provides the Postpetition Lender with relief from the automatic stay upon the occurrence of specified events of default, and after the Debtors' failure to cure or contest same successfully, to allow the Postpetition Lender, inter alia, to enforce the remedies available to it under the DIP Loan Agreement. As stated in the summary, the Interim Financing Order further provides that on the fifth business day after the Termination Date, at Postpetition Lender's election, the Prepetition Financing Group and the Postpetition Lender shall have automatic and immediate relief from the automatic stay with respect to the Aggregate Collateral provided that the Debtors may contest the right of the Postpetition Lender to exercise its remedies based upon whether an Event of Default has occurred within such five (5) business day time period, and the Postpetition Lender shall be restrained from exercising its rights and remedies with respect to Aggregate Collateral pending the Courts determination whether an "Event of Default" occurred.

Stay modification provisions of the sort requested herein are ordinary and usual features of post-petition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Loan Agreement and the Interim Financing Order.

. . .

Gordon Silver
Attorneys At Law
100 W. Liberty Street,
Suite 940
Reno, Nevada 89501
(775) 343-7500

104281-001/2013617_4

18

B. **Cash Collateral**

The Debtors seek to use cash collateral of the Prepetition Financing Group and to incur postpetition debt from the Postpetition Lender commencing immediately following the entry of the Interim Financing Order. The cash collateral and the postpetition debt will be used by the Debtors to the extent necessary to meet their working capital needs. Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless: "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." See 11 U.S.C. § 363(c)(2).

Additionally, section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest." See 11 U.S.C. § 363(e).

For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of their estates.

To the extent the fourteen day stay of Bankruptcy Rule 6004(h) may be construed to apply to the subject matter of this Motion, the Debtors request that such stay be waived.

## VIII.
## NOTICE AND REQUEST FOR FINAL HEARING

Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors request the Court to set a date for the Final Hearing. Notice of this Motion will be served via facsimile or overnight delivery on (i) the United States Trustee; (ii) counsel for the DIP Lender; (iii) counsel for the Committee or, if one has not been appointed, each of the Debtors' 20 largest unsecured creditors; (iv) counsel for the Proposed Purchaser, (v) each person or entity that has filed a Notice of Appearance in this Chapter 11 case; and (vi) potential bidders. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given or service need be made.

. . .

. . .

Gordon Silver
Attorneys At Law
100 W. Liberty Street,
Suite 940
Reno, Nevada 89501
(775) 343-7500

104281-001/2013617_4

19

## IX.
## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Interim Financing Order substantially in the form attached hereto as <u>Exhibit 2</u>; (ii) schedule a hearing to consider the Final Financing Order; and (iii) grant the Debtors such other and further relief as is just and proper.

DATED this 5th day of August, 2013.

GORDON SILVER

By: */s/ Gabrielle A. Hamm*
GERALD M. GORDON, ESQ.
BRIAN R. IRVINE, ESQ.
GABRIELLE A. HAMM, ESQ.
100 West Liberty Street, Suite 940
Reno, Nevada 89501

And

SMITH, GAMBRELL & RUSSELL, LLP
BRIAN P. HALL, ESQ.
NICHOLAS J. ROECKER, ESQ.
Promenade II, Suite 3100
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309

*Proposed Counsel to the Debtors and Debtors-in-Possession*

Gordon Silver
Attorneys At Law
100 W. Liberty Street,
Suite 940
Reno, Nevada 89501
(775) 343-7500

104281-001/2013617_4

20